Jackie N. PLACE, Plaintiff in Error,

v.

CUMMINS CONSTRUCTION COMPANY, a Corporation, Defendant in Error.

No. 42476.

Supreme Court of Oklahoma.

Nov. 10, 1970.

Rehearing Denied Dec. 22, 1970.

Charles E. Daniel, Drumright, William A. Kerr, Oklahoma City, for plaintiff in error.

Elliott C. Fenton, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, for defendant in error.

LAVENDER, Justice:

A jury returned a verdict for the only defendant, Cummins Construction Company, a corporation, in an action by Jackie N. Place, as plaintiff, for damages arising out of personal injuries sustained by him in a two-vehicle collision. The collision occurred about noon on a clear day on an east-west bridge over a railroad on U. S. Highway 66 just west of Davenport, Oklahoma, between a 1948 "Jeep" station wagon being driven in an easterly direction by the plaintiff and a Caterpillar (brand) "DW–21 Carry-all Scraper" being driven in a westerly direction by Danny Ray Lovall, an employee of the defendant corporation, who was acting within the scope of his employment at the time.

After the overruling of his motion for a new trial and amended motion for a new trial (which alleged only two grounds), the plaintiff appealed to this court, contending (in harmony with his motions for a new trial), first, that the verdict and judgment are not sustained by the evidence, because the evidence clearly shows that the plaintiff's injuries were solely and

proximately caused by the negligence of the defendant's agent, Lovall, and second, that the plaintiff was materially prejudiced, and was denied a fair trial, by reason of misconduct of one of the attorneys for the defendant in informing the jury that the investigating Highway Patrol trooper's report of the accident contained a statement that the plaintiff's vehicle was exceeding a safe speed prior to the collision.

According to the evidence (including photographs taken at the scene of the collision before either vehicle had been moved after colliding and coming to a stop), the defendant's vehicle was a motorized two axle, four wheel, "rubber-tired," front-wheel drive, bottom-loading, earth mover with a scraper for scooping material into the carrier portion of the vehicle, commonly referred to as a "uke," 13.5 feet in height, 55 feet in length, 11 feet and ten inches in width at the widest points, and weighing 60,000 pounds, which, at the time of the collision, was traveling on that particular highway under a special permit issued by the Department of Public Safety of the State of Oklahoma. The photographs of this vehicle indicate that the driver's seat and the steering wheel are located above, and slightly to the rear of, and about even with the outside edge of, the left front wheel. The defendant's driver testified that, from that point, one can easily see the ground or other surface immediately in front of the left-front wheel. The photographs also indicate that the outer edges of the rear wheels are farther apart than the outer edges of the front wheels, but lack a few inches of being as far apart as the 11 feet and 10 inches that the cargo-carrying portion of the vehicle measured in width. Plaintiff's station wagon measured five feet in width.

According to several measurements made by different witnesses who testified, the roadway surface of the bridge on which the collision occurred was exactly 24 feet wide from curb to curb.

Photographs received in evidence indicate that the approach to the bridge from the east is an incline on a sweeping curve to the right but straightens out before it gets to the east end of the bridge; that the approach to the bridge from the west is a long, straight incline with a slightly greater gradient just before reaching the west end of the bridge; and that both of the approaches had painted center-lines on the roadway thereof. The bridge had been re-surfaced and, at the time of the collision, there was no painted line or other marker on the surface of the bridge to indicate the center-line of the bridge. A short distance west of the west end of the bridge, and on the south side of the road, facing vehicles approaching from the west, was a standard road sign indicating a curve to the left, immediately below which there was another "official" sign bearing the legend "50 MPH," which the investigating Highway Patrol trooper referred to as a "suggested" speed limit, after testifying that the applicable statutory speed limit for passenger vehicles approaching the bridge from the west was 65 miles per hour.

The plaintiff, an automobile mechanic living at Davenport, Oklahoma, testified that: On the day of the accident, he, accompanied by his son Delbert, had driven in a Jeep station wagon to Chandler for some auto parts, got them, and started back to Davenport, but doesn't remember anything that happened after he passed his brother-in-law's home (which was not located), honked the horn and waived at him, until he was being taken to surgery in the hospital. When he left Davenport to go to Chandler that day, there was nothing wrong with the steering or the brakes, and the brakes were not grabbing going to or from Chandler. In his opinion, as an experienced automobile mechanic, a car's pulling one way or the other would be caused by one brake's being tighter than the others or by somebody's "whipping" the car.

The plaintiff's son, who was 14 years of age at the time of the accident, testified that: On the day of the accident, he went with his father to Chandler, leav-

ing Davenport about 11 o'clock a. m. His father drove and he rode in the passenger seat on the right. There were no rear seats in the station wagon. The windshield was clear. On the return trip, as they approached the bridge from the west, he saw a big machine on the bridge and it was about four feet over the center-line, in the east-bound lane. It felt as though his father put on the brakes. The car went off on the shoulder to the right (south), and then came back on the road, and the next thing he remembers is that some one came up to the car, after the collision, and asked him how he was. On cross-examination, he stated that they were about half way up the grade to the bridge when he first saw the machine on the bridge, and, from that point, it was impossible to see the surface of the bridge. He didn't remember then whether or not there was a painted center-line on the bridge at the time of the accident, or whether or not the brakes grabbed when their car veered to the right.

It will be noted that, if the uke were being driven on a line parallel with the north curb of the bridge, with four feet of its body projecting into or over the east-bound traffic lane, as suggested by the plaintiff's son, there would still have been eight feet of that lane unobstructed, over which the plaintiff's Jeep, which measured five feet in width, could have passed.

The defendant's driver, Danny Ray Lovall, testified that: At the time of the accident, he had had about six years of experience in operating equipment like the "uke" that he was driving that day. It had been rented from a firm in Oklahoma City, and he was returning it to Oklahoma City from a construction job near the Oklahoma-Missouri line. At the time of the trial, he had not worked for the defendant for about eight months—he had quit when he was asked to work on some jobs that would take him too far from home. On the day of the accident, he had just left Davenport, headed west, went up the curved incline toward the bridge in question, shifted into the next to lowest of five gears, and was going about 10 to 12 miles per hour as he started onto the bridge. He could see that no one was on the bridge just before he got on it, but, as he was entering the bridge, he stood up to see if any one was coming up the grade from the west, and saw no one coming. The bridge had recently been resurfaced and there was no painted center-line on it, but, just off the other end of the bridge, the painted center-line picked up again and there was a lengthwise crack in the pavement even with the center-line, so he lined up with them as he entered the bridge, to stay on the right-hand side of the bridge.

He further stated that: As he was proceeding, in that manner, across the bridge, he shifted his line of sight and saw a car approaching from the west, probably 175 or 200 feet from him. About the same instant, it looked as though the driver of the car applied his brakes. Anyway, the car went off the road to its right-hand side (south), and as it got back on the road, it "whipped" across the road sideways. As the car came into the north lane, the witness "whipped" the uke to his left—so that they wouldn't hit head-on, but would hit a glancing blow—and "hit" his clutch and brake pedals. The uke didn't leave any skid marks, so he knows that none of his brakes locked. He stated that he had been driving as close as he could to the right-hand side of the bridge, and hadn't turned to the left at all until he saw the Jeep enter his lane. The case-made discloses that the witness used his hands to show how the Jeep "whipped" across the road sideways, but his hand motions are not described.

A Mr. B. of Tulsa, Oklahoma, testified upon behalf of the defendant that: On the day of the accident, he was driving westward out of Davenport and pulled in behind the uke just before getting to the curved incline leading to the bridge involved herein. There was a no-passing zone there, so he stayed behind the uke and followed it onto the bridge. The uke was on the right-hand side of the bridge

and he believes that there would have been room enough for him to pass it on the bridge. The uke was moving between 10 and 15 miles per hour and stayed on a straight line, on the right-hand side of the bridge, until just before the collision. He could not see over or around the machine, but, suddenly, the machine turned to the left and started to stop. He first saw the Jeep after the collision, but it had not passed him, so it must have come from the west. He did not remember seeing any part of the uke on the left-hand side of the bridge until just before the collision, after the driver of the uke turned it to the left.

The Oklahoma Highway Patrol trooper who investigated the accident had had special training, and about eight years of practical experience, at the time of this accident, in estimating the speed of vehicles involved in a collision, and the probable point of impact, from the tire skid marks, debris, and other physical evidence at the scene of the accident. He testified that: When he arrived at the scene about 12:05 p. m., neither of the vehicles had been moved after they came to rest after the collision, and were blocking the highway just west of the west end of the bridge. He estimated that the point of impact was on the bridge, 20 feet east of the west end thereof and seven feet south of the north curb of the bridge, and, when they came to rest, the Jeep was crossways in the road, about five feet west of the west end of the bridge. Starting at a point 154 feet west of the point of impact, there were 40 feet of tire skid marks on the south shoulder of the road, made by an ordinary vehicle like the Jeep involved in the accident, and 114 feet of side skid marks from the point where that vehicle had come back on the road to the point of impact, and, apparently, the vehicles had traveled about 25 feet westward from the point of impact, with the uke dragging the Jeep, before the uke came to a stop. He found no skid marks left by the uke. He estimated the speed of the Jeep, at the time the driver first noticed danger, as 50 miles per

hour. In his opinion, the right front portion of the cargo body of the uke came in contact with the side of the Jeep at impact.

On cross-examination, the trooper stated that, in his opinion, based upon the physical evidence, the driver of the Jeep did not have control of it for the 114 feet from the point where it came back on the road from the south shoulder to the point of impact, and that it was skidding sideways at the time of impact. He also stated that a long gouge in the new surfacing material on the bridge, which ended at the left front wheel of the Jeep where it came to rest and obviously had been made by that wheel as it was being dragged westward from the point of impact by the uke, clearly indicated to him that the uke was moving westward, at an angle to its left, at the time of the impact.

Photographs of the vehicles (which the investigating Highway Patrol trooper stated showed the situation before either vehicle had been moved after they came to rest after the collision) show the uke setting at an angle to the highway and bridge, with the front end headed south of west and both front wheels west of the west end of the bridge and in the south traffic-lane. These photographs show the Jeep setting a few feet west of the west end of the bridge, substantially perpendicular to the painted center line on the highway and headed south, with its front end, from about the windshield forward, practically flattened and projecting under the uke in the space between the rear of its right front wheel and the slanted front of the cargo body, both rear tires fully inflated, and the rear-end of the Jeep, from a point about even with the back of the rear wheel wells, projecting out over the north shoulder of the highway. These photographs do not show any impact marks on the right-hand side of the passenger-cargo section of the Jeep, although its right-hand door is hanging at an angle from the corner-post. The left front door of the Jeep (which is open in the pictures) is badly damaged, but is bowed outward

rather than inward. There would seem to be no doubt that the impact involved some portion of the Jeep forward from its windshield and some portion of the right-hand side of the uke—the right front corner of the cargo body of the uke, in the opinion of the investigating trooper.

These photographs, and the investigating trooper's testimony concerning them and his opinions based upon all of the physical evidence at the scene of the accident, as well as the testimony of the driver of the car following the uke across the bridge, tend to support the uke driver's testimony that he kept the uke as close as possible to the right-hand (north) curb of the bridge until the plaintiff's Jeep "whipped" across the center-line of the highway into the north traffic-lane, at which time he "whipped" the uke to his left.

The only evidence to the contrary is the above-mentioned testimony of the plaintiff's son that, when he first saw the uke on the bridge, about four feet of it was over the center-line, in the south traffic-lane, but he admitted, on cross-examination, that, when he first saw the uke on the bridge (about the time that the Jeep swerved off the road to the south shoulder), the Jeep was about half way up the incline to the west end of the bridge and, from that point, it was impossible to see the surface of the bridge, and that he did not remember whether or not there was a painted center-line on the bridge at that time.

■ In Price v. Clifton (1964), Okl., 391 P.2d 252, the syllabus is as follows:

"Where, on conflicting evidence, a case goes to a jury, not claimed to have been insufficiently or improperly instructed, a judgment in accord with its verdict, will not be vacated or reversed on appeal, on account of alleged insufficiency of the evidence, if the verdict can be justified on any reasonable hypothesis or theory encompassed in the pleadings and supported by competent evidence."

■ In addition to a general denial (except as to the occurrence of the collision in question, between vehicles being operated by the drivers alleged by the plaintiff), the defendant in the present case pleaded negligence on the part of the plaintiff, and sudden emergency, unavoidable accident, and lack of negligence on its part. The plaintiff does not question the instructions given to the jury. The jury could, very well, have found from a consideration of all of the evidence that there was no negligence on the part of the defendant's uke driver and that he acted as a reasonably prudent person would have acted in similar circumstances when the plaintiff's vehicle suddenly skidded into his traffic-lane only a short distance in front of the vehicle he was driving. Thus, the verdict is reasonably supported by competent evidence and the judgment based thereon will not be vacated or reversed on the ground of insufficiency of the evidence.

Concerning his other contention, that he was materially prejudiced, and was denied a fair trial, by reason of misconduct of one of the attorneys for the defendant (Mr. Elliott C. Fenton) in informing the jury that the investigating Highway Patrol trooper's report of the accident contained a statement that the plaintiff's vehicle was exceeding a safe speed immediately prior to the accident, the plaintiff relies upon the following proceedings during the cross-examination of the trooper:

"Q. (by Mr. Fenton) Now, Mr. Neidy, I believe your testimony was to the effect that when you testified earlier that the legal speed limit there was 65 miles per hour—in fact the legal speed limit there was 50 miles per hour for traffic going in the direction of the Place station wagon, is that not right?

"A. The legal speed limit for the Place vehicle would be 65 miles per hour.

"Q. That's the general speed limit out on the open highway, is it not?

"A. That's the speed limit by law.

"Q. Well, Officer Neidy, in investigating this accident, did you not come to the conclusion that Mr. Place was traveling at excessive speed?

"Mr. Kerr: Please the court, counsel well knows that is in error, and we object.

"The Court: Will counsel approach the bench?

"(After argument at the bench out of hearing of the jury, the following was had in hearing of the jury):

"The Court: Overruled.

"Mr. Kerr: Exceptions.

"Q. (by Mr. Fenton) Trooper Neidy, I'll ask you again, at the time you made this investigation, did you not come to the conclusion that Mr. Place was driving at an excessive rate of speed?

"A. I have on my accident report that Mr. Place was driving at a speed of 50 miles per hour, and this is based on my knowledge as being a trooper, my past experience and on my schooling—now, this is actually just my opinion—just merely my opinion.

"Q. Refer now to the second page of your report, if you will, please. (Witness turns to the second page of his report)—now, I will ask you again, Trooper Neidy, if you did not come to the conclusion upon your investigation of this accident, that Mr. Place was driving at a speed which—rather, if you did not come to the conclusion Mr. Place was exceeding a safe speed?

"Mr. Kerr: Please the court, we object—Trooper has said that in his opinion it was 50 miles per hour and whether it is or is not, it is purely within the province of the jury and not to be a conclusion of this man.

"(Argument by counsel at the bench, and the following):

"The Court: Objection sustained.

"Mr. Fenton: Exceptions."

Immediately following the above-quoted proceedings, defendant offered to prove by this Highway Patrol trooper that, in his report of this accident, he determined that the vehicle driven by the plaintiff was exceeding a safe speed and that the primary cause of the accident was the speed of the plaintiff's vehicle. We cannot agree with the defendant that the questions complained of by the plaintiff were asked for the purpose of impeaching the trooper's testimony, on direct examination, which was that, in his opinion, the speed of the Jeep, at the time the driver first noticed danger, was 50 miles per hour.

However, in view of the fact that the evidence was such that the jury was not compelled to rely at all upon such "testimony" by defendant's counsel in order to reach its verdict for the defendant, we cannot say, in this case, that such conduct upon the part of defendant's attorney (which, incidentally, the plaintiff did not see fit, at the time, to ask the trial court to direct the jury to ignore, or to use as the basis for a declaration of mistrial) constituted a substantial violation of any constitutional or statutory right of the plaintiff, or probably resulted in a miscarriage of justice.

22 O.S.1961 § 1068 provides that:

"No judgment shall be set aside or new trial granted by any appellate court of this State in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

Under that statute, the conduct on the part of counsel for the defendant, complained of by the plaintiff herein, does not,

in the circumstances, constitute ground for setting aside the judgment for the defendant, or for granting the plaintiff a new trial.

Judgment affirmed.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD, JACKSON and HODGES, JJ., concur.